**HARRISBURG HOSPITAL, Plaintiff,**

v.

**Donna E. SHALALA, Secretary of the Department of Health and Human Services, Defendant.**

**No. CIV. A. 1:97–CV–0986.**

United States District Court, M.D. Pennsylvania.

March 31, 1999.

Stephen L. Banco, Jr., Harrisburg, PA, Carel T. Hedlund, Leslie Demaree Goldsmith, Jillian Wilson, Ober, Kaler, Grimes & Shriver, Baltimore, MD, for Harrisburg Hospital, plaintiff.

Larry B. Selkowitz, U.S. Attorney's Office, Harrisburg, PA, for Donna E. Shalala, Secretary of Health and Human Services, defendant.

## MEMORANDUM

CAPUTO, District Judge.

Plaintiff filed the present action on June 27, 1997. Before the Court are cross motions for summary judgment filed by the plaintiff, Harrisburg Hospital, and the defendant, Donna E. Shalala, the Secretary of the Department of Health and Human Services (the "Secretary"). The motions are fully briefed and ripe for disposition. In addition, the Court heard oral argument on the cross motions for summary judgment on September 22, 1998. There being no genuine issue as to any material fact, the Court can proceed to determine whether plaintiff or defendant is entitled to judgment in their favor as a matter of law. Because I find that the Secretary's Febru-

ary 27, 1997 final decision was arbitrary, capricious and an abuse of discretion, I will grant plaintiff's motion for summary judgment and reverse the decision of the Secretary. Consequently, defendant's motion for summary judgment will be denied.

## BACKGROUND

This civil action arises out of defendant's failure to reimburse plaintiff amounts due under the Medicare program of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, on a reasonable cost basis for the 1989 cost year. The amounts in dispute relate to plaintiff's medical education costs for two nursing programs.

### I. Governing Statutes and Regulations

The Medicare program was established in 1965 under Title XVIII of the Social Security Act (the "Act") to provide health insurance to the aged and disabled. 42 U.S.C. §§ 1395—1395cc. The Health Care Financing Administration ("HCFA") is the operating component of the Department of Health and Human Services charged with administering the Medicare program. The Medicare program consists of two main parts: (i) Part A, "Hospital Insurance Benefits," authorizes payment for primary institutional care, 42 U.S.C. §§ 1395c—1395i–4, and (ii) Part B, "Supplemental Medical Insurance Benefits," authorizes payment for physicians, certain hospital outpatient services and other non-hospital supplemental services. 42 U.S.C. §§ 1395j—1395w–4. The present action involves Part A of the Medicare program.

In order to participate in Part A of the Medicare program, a hospital must file a provider agreement with the Secretary. 42 U.S.C. § 1395cc. The Secretary's payment and audit functions under the Medicare program are often contracted-out to insurance companies, known as fiscal intermediaries. 42 U.S.C. § 1395h; 42 C.F.R. § 421.100. Fiscal intermediaries determine which providers are bound by the Secretary's regulations and the payment amounts due to the providers. *Id.*

At the close of its fiscal year, a provider must submit a cost report to the fiscal intermediary showing the costs it incurs during the fiscal year and which portion of those costs are to be allocated to Medicare. 42 C.F.R. § 413.20. The fiscal intermediary audits the cost reports and determines the total amount of Medicare reimbursement due the provider, which it publishes in a notice of program reimbursement ("NPR") that sets forth the individual expenses allowed and disallowed by the intermediary. 42 C.F.R. § 405.1803. A provider dissatisfied with the intermediary's final determination of total reimbursement may file an appeal with the Provider Reimbursement Review Board ("PRRB") within 180 days of the NPR. 42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1835. The PRRB is authorized to hold a hearing on the appeal and issue a decision. *Id.* A party may appeal the PRRB's decision to the Secretary's delegate, the Administrator of HCFA. 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1875. If the HCFA Administrator decides to review the case, he or she may affirm, reverse, modify or remand the PRRB's decision. 42 C.F.R. § 405.1875. The final decision of the PRRB, or of the HCFA Administrator if he or she exercises the right of review, is subject to judicial review. 42 U.S.C. § 1395oo(f)(1).

Prior to October 1, 1983, the Medicare program reimbursed covered inpatient hospital services on a "reasonable cost" basis, defined as the costs actually incurred less any costs unnecessary in the efficient delivery of needed health services. 42 U.S.C. § 1395(v)(1)(A). The Act authorizes the Secretary to promulgate regulations setting forth the methods for determining reasonable costs and items to be included in reimbursable services. *Id.* In 1982, Congress began to restrict reasonable cost reimbursement by limiting the rate of increase of Medicare Part A reimbursement for the operating costs of inpatient hospital services. 42 U.S.C. § 1395ww(b).

Effective October 1, 1983, Congress amended the Act and adopted a new reimbursement system for inpatient hospital services known as the Prospective Payment System ("PPS"). 42 U.S.C. § 1395ww(d). Under PPS, most hospitals are paid a prospectively determined amount for their inpatient operating costs based on national and regional rates for each patient's diagnosis at the time of discharge. *Id.* The costs of approved educational activities are specifically excluded from the definition of "inpatient operating costs" and, thus, are not included in the PPS hospital-specific, regional or national payment rates. 42 U.S.C. §§ 1395ww(a)(4) and (d)(1)(A). Instead, Medicare payments for approved educational activities continue to be made on a reasonable cost basis. 42 U.S.C. § 1395f(b); 42 C.F.R. §§ 412.113(b) and (c). The term "approved educational activities" is defined at 42 C.F.R. §§ 413.85(b).[1] Section 402.1 of the Medicare Provider Reimbursement Manual ("PRM") prepared by HCFA also defines approved educational activities.[2]

The regulations implementing the PPS set forth 13 examples of the types of activities that may be considered "approved educational activities." 42 C.F.R. § 413.85(e). Three of the these enumerated programs relate to nursing education programs, including programs for nurse anesthetists, professional nursing and practical nursing. 42 C.F.R. §§ 413.85(e)(7)-(9). The regulations further provide that an educational program not listed in subsection (e) may nevertheless be approved if it comes within the purview of the principle set forth in section 413.85.[3]

In addition, subsection (d) of the regulation lists seven specific categories of non-approved educational activities within the scope of the Medicare program.[4] The costs of these educational activities shall be reimbursed as normal inpatient operat-

1. (b) Definition—*Approved educational activities.* Approved educational activities mean formally organized or planned programs of study usually engaged in by providers in order to enhance the quality of patient care in an institution. These activities must be licensed if required by State law. If licensing is not required, the institution must receive approval from the recognized national professional organization for the particular activity.

2. *Approved Educational Activities* Approved educational activities mean formally organized or planned programs of study operated or supported by an institution, as distinguished from "on-the-job," "inservice," or similar work-learning programs. To be an allowable cost, the educational activity must be:

A. Designed to enhance the quality of health care in the institution or to improve the administration of the institution.

B. Where required, licensed by State law....

C. Where licensing is not required, approved by the recognized professional organization for the particular activity.

3. (f) *Other educational programs.* There may be other educational programs not included in the foregoing [subsection (e)] in which a provider institution is engaged. Appropriate consideration will be given by the intermediary and HCFA to the costs incurred for those activities that come within the purview of the principle when determining the allowable costs for apportionment under the Medicare program. 42 C.F.R. § 413.85(f).

4. (d) *Activities not within the scope of this principle.* The costs of the following activities are not within the scope of this principle but are recognized as normal operating costs and are reimbursed in accordance with the applicable principles(1) Orientation and on-the-job training; (2) Part-time education for bona fide employees at properly accredited academic or technical institutions (including other providers) devoted to undergraduate or graduate work; (3) Costs, including associated travel expenses, of sending employees to educational seminars and workshops that increase the quality of medical care or operating efficiency of the provider; (4) Maintenance of a medical library; (5) Training of a patient or patient's family in the use of medical appliances; (6) Clinical training of students not enrolled in an approved education program operated by the provider; and (7) Other activities that do not involve the actual operation of an approved education program including the costs of interns and residents in anesthesiology who are employed to replace anesthetists. 42 C.F.R. § 413.85(d).

ing costs. Prior to implementation of the PPS, subsection (d) only provided that orientation and on-the-job training were outside the scope of approved educational activities. 42 C.F.R. § 405.421(d) (1982).[5] The Secretary explained the significance of the different standard under the PPS for approved educational expenses in the preamble to the amended regulation:

> [42 C.F.R.] § 405.421(d) [now § 413.85(d)] distinguishes only orientation and on-the-job training as not being within the scope of this regulation. Prior to the prospective payment system, this distinction was not significant, since training costs not within the scope of section 405.421, as well as costs of approved educational activities were reimbursed on a reasonable cost basis.
>
> This is no longer true for hospitals paid under the prospective payment system, since any training costs incurred by a hospital which are within the scope of section 405.421 will continue to be reimbursed on a reasonable cost basis, while costs not within the scope of the regulation will be considered part of inpatient operating costs to be included in the prospective payment rates. As the regulation now stands, costs of many types of training activities, which we do not consider within the scope of the regulation, will nonetheless qualify for separate reasonable cost reimbursement in addition to the prospective payments. Therefore, it is important that we clearly differentiate between approved educational activities in which a hospital may be engaged and other training costs a hospital may incur. Approved educational activities are already adequately addressed. These activities are defined in section 405.421(b), while section 405.421(e) (and section 405.116(f)) list recognized approved medical and paramedical programs. Further, section 405.421(f) recognizes there may be additional approved training programs in which a provider is engaged.

48 Fed.Reg. 39,797 (September 1, 1983).

## II. The Factual and Procedural History

Plaintiff is a short-term, acute-care, nonprofit hospital located in Harrisburg, Pennsylvania. (A.R. at 37). Plaintiff is classified as a provider under the Medicare program. 42 U.S.C. § 1395cc. During fiscal year 1989, plaintiff operated two nursing education programs-the School of Enterostomal Therapy ("SET") and the Phase II Critical Care Nursing Program ("CCNP"). (A.R., pp. 44, 136–9).

Plaintiff founded the SET in 1969 as an entry-level educational program for nurses wishing to specialize in enterostomal therapy.[6] *Id.*, pp. 136–9, 421–22. Plaintiff offered this eight-week, full-time program approximately four times per year. *Id.*, pp. 140, 179–80, 421–22. Although Pennsylvania did not require licensing of the SET, the school was accredited for fiscal year 1989 by the International Association for Enterostomal Therapy. *Id.*, pp. 140–42, 418–19, 421–22. The teachers at the SET supervised and provided enterostomal therapy care to plaintiff's patients during the clinical portion of the program. *Id.*, pp. 142–43, 194–95.

During fiscal year 1989, plaintiff also operated the CCNP, a ten-week, full-time program that provided both didactic and clinical instruction for registered nurses. *Id.*, pp. 145, 424–37. Plaintiff did not permit registered nurses to work unsupervised in the critical care units (coronary care, intensive care and intermediate care) without special training in the CCNP or a similar program. *Id.*, pp. 145–47. Prior to the implementation of the CCNP, plaintiff experienced an acute shortage of criti-

---

**5.** The regulation for approved educational activities was previously found at 42 C.F.R. § 405.421, but was recodified in 1986 and relocated in the Code of Federal Regulations at its present location, 42 C.F.R. § 413.85.

**6.** Enterostomal therapy is the management of stoma care, draining wounds, fistulas, pressure sores and incontinence rehabilitation.

cal care nurses and was forced to close some of its critical care beds. *Id.* at 148. After graduating from the CCNP, registered nurses were eligible to be hired as critical care nurses and thus provided a pool of qualified nurses from which plaintiff could staff its critical care areas. *Id.*, pp. 44, 145–47, 181–82. Although Pennsylvania did not require licensing of the CCNP, the program was accredited for fiscal year 1989 by the American Association of Critical Care Nurses. *Id.*, pp. 150–54, 337–38, 439.

In fiscal year 1983, plaintiff's base year for the PPS, plaintiff submitted three programs to the intermediary for recognition as pass-through nursing and paramedical education costs: the SET, the CCNP and the HAAC Nursing Contract. *Id.*, pp. 209–11, 360–63. The PPS base year was significant because the amount of operating costs incurred during that year determined plaintiff's hospital-specific rate for future years. Thus, this hospital-specific rate, multiplied by an inflation factor, would determine plaintiff's future operating cost payments under the PPS. In 1983, the intermediary determined that the HAAC Nursing Contract did not qualify for pass-through treatment as an approved educational activity and reclassified the costs associated with the contract from educational to operating expenses. *Id.*, pp. 45, 215. However, the intermediary allowed the costs associated with the SET and CCNP to be qualified for pass-through treatment as approved educational activities. *Id.*, pp. 213–15. From fiscal year 1983 through fiscal year 1988, plaintiff was reimbursed by the intermediary on a reasonable cost basis for the Medicare portion of the costs associated with the SET and CCNP.

In fiscal year 1989, plaintiff again claimed the cost of operating the SET and CCNP on a pass-through, reasonable cost basis. *Id.*, pp. 205, 244. This time, however, the intermediary decided to contact HCFA for guidance in determining whether the SET and the CCNP qualified as approved educational activities under 42 C.F.R. § 413.85. *Id.* at 389. HCFA advised the intermediary that plaintiff's programs should be classified as continuing education programs to be reimbursed as normal operating costs under the PPS. *Id.* On September 30, 1991, the intermediary advised plaintiff that it had adjusted plaintiff's 1989 cost report by reclassifying the costs associated with the SET and CCNP from pass-through approved educational activities to normal operating costs. *Id.*, pp. 548–58.

Plaintiff appealed the intermediary's decision to the PRRB. On February 27, 1997, the PRRB reversed the intermediary's adjustment and held that the SET and the CCNP satisfied all of the stated requirements for approved educational activities set forth under 42 C.F.R. § 413.85. *Id.* at 44. In reaching its decision, the PRRB found substantial evidence to support that the SET and the CCNP were formally organized and planned programs of study which had received approval from their respective national professional organizations. *Id.* The PRRB further found that the SET and CCNP were not on-the-job training or in-service education programs under 42 C.F.R. § 413.85(d) because both programs were more comprehensive and protracted than conventional employee training courses or educational seminars and workshops devised to earn continuing professional education credits. *Id.* Finally, the PRRB found that even if plaintiff should have sought prior approval for the educational activities, the intermediary had given tacit approval for the SET and CCNP by allowing them as pass-through costs after the intermediary completed its audit of the plaintiff's cost report for the fiscal 1983 base year. *Id.* at 45.

On April 24, 1997, the HCFA Administrator reversed the PRRB's decision, holding that the costs associated with the SET and CCNP were excluded from pass-through treatment by 42 C.F.R. § 413.85(d) because the SET and CCNP were "educational seminars and workshops

that increase the quality of medical care or operating efficiency of the provider." *Id.* at 3. The Administrator found that the record contained "uncontradicted evidence" that the SET and CCNP were short in duration and that individuals who completed the programs did not enter a new profession. *Id.* at 13. In further support of his decision, the Administrator cited a 1992 notice of proposed rulemaking ("NPRM"), published by the Secretary, which used enterostomal therapy as an example of an excluded educational activity. *Id.* at 12. While the Administrator did not specifically rely on the 1992 NPRM, he explained that its terms were further evidence that the intermediary's disallowance of the costs associated with the SET and CCNP was proper. *Id.* at 13. The Administrator's decision constitutes the final administrative decision of the Secretary. *Id.* at 14.

On June 27, 1997, plaintiff filed a timely complaint with this Court seeking judicial review of the Secretary's final decision. In its complaint, plaintiff alleges claims under the Administrative Procedure Act (counts I, II and III), for a violation of the Medicare Act (count IV) and for a violation of the Fifth Amendment (count V). Before the Court are plaintiff's motion for summary judgment (Doc. No. 16) and defendant's motion for summary judgment (Doc. No. 23).

## STANDARD OF REVIEW

■ The Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.,* which is incorporated by the Social Security Act, *see* 42 U.S.C. § 1395*oo*(f)(1), commands reviewing courts to hold unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or unsupported by substantial evidence. 5 U.S.C. § 706(2)(A). Grounds for concluding that the agency acted arbitrarily and capriciously include its reliance on factors outside those Congress intended for consideration, a complete failure by the agency to

consider an important aspect of the problem, or an agency's explanation that is contrary to, or implausible in light of, the evidence. *Fertilizer Institute v. Browner,* 163 F.3d 774, 777 (3d Cir.1998) (citing *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136.(1971).

■ A reviewing court must give substantial deference to an agency's interpretation of its own regulations. *Thomas Jefferson University v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (citing *Martin v. Occupational Safety and Health Review Comm'n,* 499 U.S. 144, 150–151, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991); *Lyng v. Payne,* 476 U.S. 926, 939, 106 S.Ct. 2333, 90 L.Ed.2d 921 (1986); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965)). "The Court's task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.' " *Id.* (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)). The Court must defer to the Secretary's interpretation unless an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." *Id.* (quoting *Gardebring v. Jenkins,* 485 U.S. 415, 430, 108 S.Ct. 1306, 99 L.Ed.2d 515 (1988)). This broad deference is all the more warranted when, as here, the regulation concerns a complex and highly technical regulatory program, in which the identification and classification of relevant criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns. *Id.* (citing

*Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991)).

## DISCUSSION

Plaintiff moves for summary judgment on its three claims under the APA. Count I alleges, pursuant to 5 U.S.C. §§ 553 and 706(2)(A), that defendant's refusal to recognize the SET and CCNP as approved educational activities was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law. (Compl., Doc. No. 1 ¶¶ 43, 44). Count II alleges, under 5 U.S.C. §§ 553(b) and 706(D), that defendant violated the notice-and-comment rulemaking procedures of the APA in determining that educational activities may only be approved if they are not short in duration and that students enter a new profession upon completion of the program. *Id.* ¶ 46. Count III alleges, pursuant to 5 U.S.C. §§ 553(b) and 706(D), that defendant violated the procedural requirements of the APA by making retroactive changes to 42 C.F.R. § 413.85. *Id.* ¶ 48. Defendant counters that its decision comported with the APA procedures and was not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law.

Plaintiff first argues that the Secretary's decision was arbitrary and capricious because the SET and CCNP both meet the definition of approved educational activities in section 413.85(b) and do not fall within any of the exclusions set forth in section 413.85(d). The Act authorizes the Secretary to promulgate regulations setting forth the methods for determining costs and items to be included in reimbursable services. 42 U.S.C. § 1395f. In accordance with this authority, the Secretary defined approved educational activities as:

> a formally organized or planned program of study usually engaged in by providers in order to enhance the quality of patient care in an institution. These activities must be licensed if required by State law. If licensing is not required, the institution must receive approval from the recognized national professional organization for the particular activity.

42 C.F.R. § 413.85(b). The regulations further differentiate between approved and nonapproved educational activities. Section 413.85(d) provides seven specific categories of educational activities that are not within the scope of the principle in section 413.85 and are thus not approved educational activities. Section 413.85(e) provides 13 examples of recognized professional and paramedical educational training programs conducted by provider institutions. Section 413.85(f) provides that there may also be other educational programs not included in section 413.85(e) that will be given appropriate consideration by the intermediary and HCFA. In the Omnibus Budget Reconciliation Act of 1989, Congress directed the Secretary to publish regulations clarifying the rules governing which costs of approved educational activities are allowable under the PPS. (A.R. at 12). In 1992, the Secretary published a Notice of Proposed Rulemaking ("1992 NPRM") addressing this issue. *Id.*; 57 Fed.Reg. 43,659–43,673 (September 22, 1992). The preamble to the 1992 NPRM states, in relevant part:

> The programs included in our list of approved programs are generally programs of long duration that are designed to develop trained practitioners in a nursing or allied health discipline, such as professional nursing or occupational therapy. This is contrasted with a continuing education program of a month to a year in duration in which a practitioner such as a registered nurse receives training in a specialized skill such as enterostomal therapy. While such training is undoubtedly valuable in enabling the nurse to treat patients with special needs and in improving the level of patient care in a provider, the nurse, upon completion of the program, continues to function as à registered nurse, albeit one with special skills. Further

distinction can be drawn between such a situation and one in which a registered nurse undergoes years of training to become a CRNA.

*Id.;* 57 Fed.Reg. at 43,670. The Secretary has not yet published the 1992 NPRM as a final regulation.

The evidence regarding the duration, accreditation and scope of the SET and CCNP is uncontroverted in the record. The SET and CCNP were full-time programs of study taught for eight and ten weeks, respectively. (A.R., pp. 140, 145). Although Pennsylvania law did not require licensing for the SET or CCNP, the SET was accredited for fiscal year 1989 by the International Association for Enterostomal Therapy and the CCNP was accredited for fiscal year 1989 by the American Association of Critical Care Nurses. *Id.,* pp. 140–42, 150–54, 337–38, 418–19, 439, 421–22. The teachers at the SET supervised and provided enterostomal therapy care to plaintiff's patients during the clinical portion of the program. *Id.,* pp. 142–43, 194–95. Graduates of the CCNP provided a pool of qualified nurses from which plaintiff could staff its critical care areas. *Id.,* pp. 44, 145–47, 181–82. There are no genuine issues regarding any of these facts.

After a full review of the administrative record, the Secretary reversed the PRRB and found that the SET and CCNP were not approved educational activities because they fell within the exclusion at 42 C.F.R. § 413.85(d)(3) of costs for "educational seminars and workshops that increase the quality of medical care or the operating efficiency of the provider." (A.R. at 13). In reaching this conclusion, the Secretary focused on the fact that the SET and CCNP were short in duration and individuals who completed the programs attained new skills but did not enter a new profession. *Id.* The Secretary provided no further basis for her decision. Nor did the Secretary explain how she determined that the SET and CCNP were educational seminars and workshops. Thus, the only stated basis for the Secretary's decision was

her determination regarding the length of the programs and the professional status of those completing the programs. Neither the Act nor the regulations contain any requirement that approved educational activities be of long duration or that individuals enrolled in the educational activity enter a new profession upon completion of the program. Moreover, the first and only time the standards of duration and new profession appear as controlling are in the 1992 NPRM. A review of the record, the Act and the regulations leads to the conclusion that the Secretary's decision was based on the language of the 1992 NPRM.

■ The Court concludes that the Secretary's final decision was arbitrary and capricious because (1) it is inconsistent with the evidence in the record and the provisions of section 413.85, and (2) the only evidence to support the Secretary's conclusion was contained in the 1992 NPRM, which has yet to be published as a regulation. First, the SET and CCNP met the general definition for approved educational activities set forth in section 413.85(b). Both programs were formally organized and planned programs of study. Each program enhanced the quality of patient care in plaintiff's hospital, by either enhancing patient care during the clinical portion of the SET or by providing a pool of qualified nurses from which plaintiff could staff its critical care areas. Each program was approved by its recognized professional organization. Second, neither program fell within the seven specific exclusions set forth in section 413.85(d). While the Secretary concluded that the SET and CCNP were educational seminars and workshops that increase the quality of medical care or the operating efficiency of the provider, and therefore excluded under section 413.85(d)(3), there is no evidence in the record to support this conclusion. Further, while section 413.85(e) lists 13 recognized professional and paramedical training programs, the regulation does not suggest that there are any common traits shared by the listed

programs. There simply is no mention in the regulation that the 13 programs have a duration greater than one year or that individuals who complete the programs enter a new profession. The only source in the record for the stated bases for the Secretary's decision viz the SET and CCNP were not programs of long duration and persons who completed the programs did not enter a new profession, was the 1992 NPRM, which has yet to be published as a final regulation. In the absence of the 1992 NPRM, the Secretary's decision is without any support in the record and is therefore arbitrary and capricious. *See Shalala v. St. Paul–Ramsey Medical Center*, 50 F.3d 522 (8th Cir.1995) ("we cannot defer to the Secretary's interpretation, which reads unwritten and additional terms into the rule in question [PRM § 312]"); *Jack Wood Construction Co., Inc. v. United States Department of Transportation*, 12 F.Supp.2d 25 (D.D.C. 1998) (holding that the DOT's denial of certification was arbitrary and capricious where the DOT misapplied the regulations and where the remaining reason for denial was insufficient in view of the applicable regulations and the record evidence). The Court finds that the SET and CCNP meet the general definition for approved educational activities. The Court further finds that there is no evidence in the record that either program falls within one of the seven specific categories for exclusion. While neither program is listed in section 413.85(e), section 413.85(f) provides that the intermediary and HCFA will give appropriate consideration to other educational activities that come within the purview of the principle in section 413.85.

Even applying the exceptionally deferential standard of review, I nevertheless find that the Secretary's interpretation of section 413.85 to contain an unwritten but understood requirement that approved educational programs be long in duration and individuals who complete the programs enter a new profession is "plainly erroneous or inconsistent" with the text of section 413.85. The Secretary's interpretation adds requirements to section 413.85 that are neither explicit in the rule, nor apparent from its plain meaning. On the other hand, the two programs in question fit within the stated requirements of the regulations. I therefore find that the Secretary's determination that the SET and CCNP fell within the exclusion for educational seminars and workshops was arbitrary and capricious in light of the evidence in the record. Accordingly, I will grant plaintiff's motion for summary judgment and reverse the Secretary's decision.

An appropriate order will follow.

### ORDER

NOW, this 31st day of March, 1999, it is hereby ORDERED that:

1. Plaintiff's motion for summary judgment (Doc. No. 16) is GRANTED.

2. Defendant's motion for summary judgment (Doc. No. 23) is DENIED.

3. The April 24, 1997 decision of the Administrator of the Health Care Financing Administration, which is the final decision of the Secretary, is REVERSED and VACATED.

4. The case is REMANDED to defendant, Secretary of the Department of Health and Human Services, with instructions to reimburse plaintiff, on a reasonable cost basis, for its costs related to the operation of the School of Enterostomal Therapy and the Phase II Critical Care Nursing Program for the 1989 fiscal year.

5. The defendant shall pay to plaintiff the additional amount of Medicare reimbursement due for the 1989 fiscal year for the costs associated with the School of Enterostomal Therapy and the Phase II Critical Care Nursing Program.

6. The defendant shall pay to plaintiff interest on the additional Medicare reimbursement payments resulting from this Order, at the applicable rate of in-

terest and during the period provided by 42 U.S.C. § 1395oo(f)(2).